```
Approved:  /s Richard Cooper   /s Daniel Tracer_
           RICHARD COOPER/DANIEL TRACER
           Assistant United States Attorneys

Before:    HONORABLE SARAH L. CAVE
           United States Magistrate Judge      20 MAG 9381
           Southern District of New York
```

```
- - - - - - - - - - - - - - - - - x
                                   :   SEALED COMPLAINT
UNITED STATES OF AMERICA           :
                                   :   Violations of
              - v. -               :   15 U.S.C. §§ 77q, 77x; 18
                                   :   U.S.C. §§ 152(6), 1343,
DANIEL KAMENSKY,                   :   1512 & 2.
                                   :
              Defendant.           :   COUNTY OF OFFENSE:
                                   :   New York
- - - - - - - - - - - - - - - - - x
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

FATIMA HAQUE, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Fraud in the Offer or Sale of Securities)

1. On or about July 31, 2020, in the Southern District of New York and elsewhere, DANIEL KAMENSKY, the defendant, willfully and knowingly, in the offer and sale of securities, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly employed a device, scheme, and artifice to defraud, to wit, KAMENSKY, in violation of his fiduciary duties, engaged in a scheme to defraud the unsecured creditors in the official bankrupty proceeding of Neiman Marcus Group Ltd LLC ("Neiman Marcus") by pressuring a global investment bank (the "Investment Bank") to withdraw its bid to purchase certain securities from the unsecured creditors at a higher price than KAMENSKY's hedge fund, Marble Ridge Capital LP ("Marble Ridge"), had offered for those securities.

(Title 15, United States Code, Sections 77q(a)(1) and 77x; Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2.      On or about July 31, 2020, in the Southern District of New York and elsewhere, DANIEL KAMENSKY, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KAMENSKY, in violation of his fiduciary duties, engaged in a scheme to defraud the unsecured creditors in Neiman Marcus's official bankrupty proceeding by pressuring the Investment Bank to withdraw its bid to purchase certain securities from the unsecured creditors at a higher price than KAMENSKY's hedge fund, Marble Ridge, had offered for those securities.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Extortion and Bribery In Connection With Bankruptcy)

3.      On or about July 31, 2020, in the Southern District of New York and elsewhere, DANIEL KAMENSKY, the defendant, knowingly and fraudulently gave, offered, received, and attempted to obtain money and property, remuneration, compensation, reward, advantage, and promise thereof for acting or forbearing to act in any case under Title 11 of the United States Code, to wit, KAMENSKY pressured the Investment Bank to withdraw its bid to purchase certain securities from the unsecured creditors by threatening to (i) use his position on the creditors' committee to ensure that the Investment Bank's bid would be rejected, and (ii) withhold Marble Ridge's future business from the Investment Bank, so that Marble Ridge could obtain those securities at a lower price.

(Title 18, United States Code, Sections 152(6) and 2.)

## COUNT FOUR
### (Obstruction of Justice)

4.      From at least on or about July 31, 2020 up to and including on or about August 4, 2020, in the Southern District of

2

New York and elsewhere, DANIEL KAMENSKY, the defendant, corruptly obstructed, influenced, and impeded an official proceeding, and attempted to do so, to wit, KAMENSKY sought to influence a senior employee at the Investment Bank ("IB Employee-1") into providing a false account of a conversation KAMENSKY had with IB Employee-1, in order to impede a criminal investigation of KAMENSKY's conduct.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I have been a Special Agent with the FBI for approximately two years. I am currently assigned to a squad that is responsible for investigating violations of the federal securities laws, as well as wire and mail fraud laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for committing such offenses.

6. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including documents provided by others, from speaking with witnesses, and from conversations with representatives of the Office of the United States Trustee (the "UST") and the United States Securities and Exchange Commission (the "SEC"). Because this affidavit is being submitted for a limited purpose, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part unless otherwise noted. Where dates, figures, and calculations are set forth herein, they are approximate.

## Background

### The Defendant, Marble Ridge, and the Investment Bank

7. At all times relevant to this Complaint, DANIEL KAMENSKY, the defendant, was the principal of Marble Ridge, a hedge fund that invests in securities in distressed situations, including bankruptcies. Marble Ridge, which had assets under management of more than $1 billion as of at least early 2020, was based in Manhattan, New York. Prior to opening Marble Ridge, KAMENSKY worked for many years as a bankruptcy attorney at a well-known international law firm, and as a distressed debt

investor at prominent financial institutions.

8. At all times relevant to this Complaint, the Investment Bank was a diversified financial services company headquartered in New York, New York. Marble Ridge conducted business with the Investment Bank, including as a client.

### The Bankruptcy Process and the Office of the United States Trustee

9. The bankruptcy laws, or the bankruptcy code, allow a debtor to seek the aid of the United States Bankruptcy Court to restructure and reorganize its debt and thereby continue as a going concern. The Chapter 11 bankruptcy process typically begins with the filing of a bankruptcy petition in bankruptcy court and proceeds until the court approves a plan of reorganization (a "Plan").

10. Among the participants in a Chapter 11 bankruptcy are unsecured creditors. Unsecured creditors have claims that are not backed by any assets of the debtor, and therefore typically receive lesser pro rata recoveries of their claims, if they receive any recovery, than secured creditors.

11. The UST, a component within the U.S. Department of Justice, plays a critical role in bankruptcies throughout the United States by serving as a watchdog over the bankruptcy process. Among the duties entrusted to the UST in connection with bankruptcy proceedings, is the appointment of certain representatives of the unsecured creditors of a filing debtor to a "creditors' committee." A creditors' committee generally represents a wide range of unsecured creditors and is formed to obtain the largest possible recovery for the unsecured creditors in a Plan. By statute, members of the creditors' committee are required to act as fiduciaries to all unsecured creditors, thus requiring them to, among other things, act with the highest standards of honesty and integrity, and put the interests of the collective group of unsecured creditors above their own personal self-interest.

### The Neiman Marcus Bankruptcy and MyTheresa

12. From my review of public filings in the United States Bankruptcy Court for the Southern District of Texas and my conversations with representatives of the UST, I have learned, among other things, that:

    a. Neiman Marcus is an American chain of luxury department stores with stores located across the United States.

As of at least approximately 2013, Neiman Marcus was privately owned by two investment funds.

      b.   In or about May 2020, Neiman Marcus filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). Prior to its bankruptcy filing, Neiman Marcus transferred MyTheresa--an online luxury fashion retailer that was owned by Neiman Marcus--to another Neiman Marcus entity that did not file for bankruptcy. At the time of the bankruptcy filing, MyTheresa was considered one of the most valuable assets within the family of Neiman Marcus entities. Some of Neiman Marcus's creditors alleged that transfer to be a fraudulent conveyance for the purpose of removing that asset from the pool of available assets to creditors in the bankruptcy (the "Alleged Fraudulent Conveyance").

      c.   At the outset of the Neiman Marcus bankruptcy, the UST formed an Official Committee of Unsecured Creditors (the "Committee"), composed of nine entities who all were unsecured creditors of Neiman Marcus. Marble Ridge, through DANIEL KAMENSKY, the defendant, applied to be on the Committee and was thereafter appointed to be a member of the Committee. At the time, Marble Ridge was one of the largest unsecured creditor of Neiman Marcus.

      d.   In KAMENSKY's signed application to serve on the Committee, KAMENSKY attested that he agreed to a number of conditions, including that "[m]embers of the Committee are fiduciaries who represent all unsecured creditors as a group. . . ." In the cover email transmitting that application to the UST, the General Counsel of Marble Ridge wrote that "Mr. Kamensky has more than 20 years of bankruptcy and investing experience and fully understands the fiduciary responsibilities associated with membership on the Committee. Mr. Kamensky is committed to devote the time and energy necessary to earnestly represent all unsecured creditors."

      e.   During the bankruptcy process, the Committee had negotiated with the owners of Neiman Marcus (also known as the "Sponsors")--who also controlled the Neiman Marcus entity to which MyTheresa was transferred--to obtain Series B shares in MyTheresa (the "MYT Securities") in exchange for providing a release from potential claims against them for the Alleged Fraudulent Conveyance. Ultimately, the Committee was successful in coming to a settlement to obtain 140 million shares of MYT Securities for the benefit of certain unsecured creditors of the bankruptcy estate (the "Settlement"). The MYT Securities represented an ownership interest in MyTheresa and were considered highly illiquid (i.e., they did not trade on any public exchange). The Committee and the

Sponsors intended for the Settlement to be included in the final bankruptcy plan that was subject to confirmation by the Bankruptcy Court in or about early September 2020.

       f. As further described below, the Committee also discussed the possibility of entertaining an offer from a financial firm interested in purchasing MYT Securities from certain unsecured creditors (the "Cashout Option"). Under the terms of the Cashout Option, a financial firm would offer to purchase MYT Securities from any unsecured creditor who preferred to receive cash as part of the Settlement rather than the illiquid MYT Securities. In particular, up until at least on or about July 31, 2020, KAMENSKY and the Committee were discussing the possibility of Marble Ridge providing the Cashout Option.

       g. On or about August 5, 2020, after the Bankruptcy Court was advised by representatives of the Committee that KAMENSKY had pressured the Investment Bank not to bid on providing the Cashout Option for the MYT Securities, the Bankruptcy Court directed that the UST conduct an investigation (the "UST Investigation") and thereafter to file a report with the Bankruptcy Court.

## The Fraudulent Scheme

    13. As part of my investigation, I have reviewed the report filed by the UST, dated August 19, 2020 (the "Trustee Report"), as well as documents obtained by the UST during the UST Investigation and transcripts of interviews conducted by the UST with DANIEL KAMENSKY, the defendant, and other individuals. I have also interviewed IB Employee-1 as well as a senior analyst at the Investment Bank ("IB Employee-2," and collectively the "IB Employees"). As a result of that review and those interviews, I have learned, among other things, that:

6

### KAMENSKY Learns that the Investment Bank Indicated Intent to Make a Higher Bid for the MYT Securities

a. In or about late July 2020, KAMENSKY proposed to the Committee that Marble Ridge provide the Cashout Option by purchasing, for twenty cents per share, 60 million MYT Securities from any unsecured creditor wishing to sell MYT Securities it obtained under the Settlement. The Committee agreed to negotiate with Marble Ridge, which negotiations would have needed to be completed quickly and in advance of a court hearing scheduled for August 3, 2020, so that the agreement could be presented to the Bankruptcy Court for inclusion in the bankruptcy reorganization plan.

b. On or about July 30, 2020, the IB Employees were contacted by a client of the Investment Bank (the "Client") who expressed interest in making a bid to purchase MYT Securities from unsecured creditors who elected the Cashout Option. On the morning of July 31, 2020, the IB Employees discussed a plan for the Investment Bank to move forward with a proposal to the Committee to buy the MYT Securities for the Client and potentially for others.

c. That morning, the IB Employees informed the financial and legal advisors to the Committee that the Investment Bank was prepared to provide a Cashout Option to purchase MYT Securities for a price "in the thirties" (i.e., between thirty and forty cents per share), a price that was higher than the twenty cents per share that was offered by Marble Ridge.

d. At or about 3:15 p.m. on or about July 31, 2020, the financial and legal advisors to the Committee called KAMENSKY and informed him, in substance and in part, that the Investment Bank had made an offer for the MYT Securities in the range of thirty cents per share.

### KAMENSKY Pressures the Investment Bank

e. Shortly after that call concluded, KAMENSKY sent a Bloomberg chat message to the head trader at Marble Ridge (the "MR Trader"), asking the MR Trader to check the text messages on his phone. Thereafter, KAMENSKY and the MR Trader had the following text message exchange about the need to prevent the Investment Bank from placing a bid for the MYT Securities:

> KAMENSKY: [IB Employee-2] from [the Investment Bank] called the UCC counsel and offered to buy the [MYT Securities] at 30 cents,

7

>                         that is a monumental mistake. I'm getting
>                         [IB Employee-1] now. he needs to talk me.
>                         let me know. They are threatening to put
>                         a bid in.
>
> MR Trader:              For nmg [Neiman Marcus]??
>
> KAMENSKY:               yes i just texted [IB Employee-1]
>
> MR Trader:              Yikes what did we bid.  Those guys man I
>                         hope they were just ignorant to our
>                         interests

   f. At or around the same time as the text message exchange above, KAMENSKY engaged in a Bloomberg chat message exchange with IB Employee-1 in which he pressed IB Employee-1 not to submit a bid for the MYT Securities:

> KAMENSKY:               Need you NOW
>
> KAMENSKY:               Where can I reach you
>
> IB Employee-1:          Call me in 10min
>
> * * *
>
> KAMENSKY:               Tell [IB Employee-2] to stand DOWN
>
> IB Employee-1:          Im on an inernal [sic] call
>
> KAMENSKY:               And let's talk
>
>        * * *
>
> KAMENSKY:               Do I need to reach out to [IB Employee-
>                         2]
>
> KAMENSKY:               DO NOT SEND IN A BID

   g. At or about 3:45 p.m. on or about July 31, 2020, the IB Employees spoke with KAMENSKY on the phone.  According to the IB Employees, in that conversation, in substance and in part, KAMENSKY was highly agitated and told the Investment Bank to stand down and not put in a bid for the MYT Securities.  In particular, KAMENSKY explained that he had been respsonsible for getting the MYT Securities as part of the Settlement for the unsecured creditors and had incurred $3.5 million in legal fees in doing so. Accordingly, KAMENSKY believed that Marble Ridge should have the exclusive right to purchase MYT Securities from the unsecured

creditors. KAMENSKY further said that he would use his official role as co-chair of the Committee to prevent the Investment Bank from acquiring the MYT Securities. KAMENSKY also stated that Marble Ridge had been a good partner to the Investment Bank, but that if the Investment Bank moved forward with its bid for the MYT Securities, Marble Ridge would cease doing business with the Investment Bank. According to the IB Employees, at no point during that call did KAMENSKY ask whether the Investment Bank had been serious in making a bid for the MYT Securities or whether the Investment Bank had adequate financing to advance such a bid.

### The Investment Bank Withdraws the Higher Bid

h. Following this phone call, on or about July 31, 2020, as a result of KAMENSKY's pressure, the Investment Bank decided to not make a bid to purchase the MYT Securities. Shortly thereafter, the IB Employees called KAMENSKY and informed him of the decision not to bid, but advised KAMENSKY that they would be transparent with other parties about the reason for withdrawing the bid. KAMENSKY responded, in substance and in part, that he was grateful for that decision and that he was indebted to them.

i. At approximately 5:00 p.m. on or about July 31, 2020, the IB Employees spoke with the legal advisor to the Committee and informed him, in substance and in part, that the Investment Bank was withdrawing from making a bid because KAMENSKY -— a client of the Investment Bank —- had asked it to do so.

j. At approximately 7:00 p.m. on or about July 31, 2020, the legal advisor to the Committee and other professional advisors to the Committee spoke with counsel for Marble Ridge (the "Marble Ridge Counsel") and informed him of the substance of the call from the IB Employees. The Marble Ridge Counsel said, in substance and in part, that he would have to speak with KAMENSKY. The Marble Ridge Counsel thereafter contacted advisors to the Committee and falsely informed them, in substance and in part, that KAMENSKY had not asked the IB Employees not to bid; but instead, had told the IB Employees to place a bid for the MYT Securities only if the Investment Bank was serious.

### KAMENSKY Attempts to Cover-up the Fraud

k. Around this same time, KAMENSKY contacted IB Employee-1 and attempted to influence what IB Employee-1 would tell others (including the Committee and law enforcement) about KAMENSKY's attempt to block the Investment Bank's bid for the MYT Securities. At approximately 7:42 p.m., KAMENSKY sent a Bloomberg chat message to IB Employee-1 that read "Are you there?" The two

9

spoke shortly after 8:00 p.m. According to IB Employee-1, KAMENSKY began the call by saying, in substance and in part, "this conversation never happened." IB Employee-1, concerned that KAMENSKY would engage in unethical or unlawful behavior, then began recording the call.

        l.  During the recorded portion of the call, in substance and in part, KAMENSKY asked why IB Employee-1 had said that KAMENSKY threatened IB Employee-1 and asked if IB Employee-1 knew that could result in KAMENSKY going to jail. KAMENSKY further asked IB Employee-1 to falsely say instead that it was a misunderstanding and KAMENSKY had actually suggested that the Invsetment Bank only bid if it was serious. According to a draft transcript of that recording, during that call, the following was said, among other things:

> KAMENSKY: Why would you tell committee counsel that I threatened you? Why would you tell them that?
>
>        \* \* \*
>
> KAMENSKY: Do you understand . . . I can go to jail? I can go to jail. Do you understand that?
>
> IB Employee-1: Dan. Do you understand I went in to them [the Committee] this morning telling them I was going to bid, okay? You then contact me on IB and you say I need to talk to you now. Stand down. Do not bid. . . . Hold on. Hold on a second, Dan. Listen to me. And then you call me and you say, do not bid. It's going to be a relationship issue, and so I said okay. Dan's a good relationship. What he's asking me to do makes me a little bit uncomfortable. So, I thought about it and I said okay, I'm fine doing it, but I'm disclosing why I'm not bidding.
>
> KAMENSKY: Okay. Well . . . I might go to jail. Okay? If you had told me that . . . . The position I'm going to take is this is a huge misunderstanding and I hope you – I pray you tell them that it was a huge misunderstanding, okay, and I'm going to invite you to bid and be part of the process . . . . me saying to you, okay,

10

|   |   |
|---|---|
|  | this is going to be my view on what happened okay, and you can decide if you don't want to agree or not. But I'm telling you . . . this is going to the U.S. Attorney's Office. This is going to go to the court. Like, do you want to be dragged into this? Like, bid all you want but don't – don't – don't put me in jail. |

                \* \* \*

IB Employee-1:   I honestly . . . don't want anything to do with this.

KAMENSKY:   . . . It's too late now. They're going to report this to the U.S. Attorney's Office, okay? . . . The U.S. Attorney is going to investigate this. My position to them is this. I said to them, this is a huge misunderstanding, okay, humongous misunderstanding and I told them – the only thing I said was if you're not real don't bid and if they're real then they should bid. Because otherwise the U.S. Attorney is investigating this then, okay? They're going to report it, okay, and my position . . . is going to be look, this was a huge misunderstanding. . . . [A]ll I told them was if they're not real they shouldn't bid.

                \* \* \*

KAMENSKY:   [P]lease . . . help me out here. . . . I mean, like, talk to me here ,talk to me. How do we salvage this?

                \* \* \*

KAMENSKY:   . . . Like, this is like, like, the committee counsel is going to report this. I can't stop that, okay? There's no question in my mind that they're going to report it. THe only thing that I can say to them is that this is a huge misunderstanding.

11

\* \* \*

KAMENSKY: . . . [I]f you're going to continue to tell them what you just told me, I'm going to jail, okay? Because they're going to say that I abused my position as a fiduciary, which I probably did, right? Maybe I should go to jail. But I'm asking you not to put me in jail.

IB Employee-1: . . . Dan [] I would never lie for anyone, okay, like 100 percent clear because that in and of itself is a crime and I have ethics...

\* \* \*

KAMENSKY: . . . Just so you know I'm not asking you to lie, okay, and all I'm saying is that if that's what I said that's not at all what I intended and I apologize, okay? . . . . I'm telling you that what I intended to say, okay, is if you're not real don't bid but if you're real then you should bid, and . . . for the relationship I would tell you that's exactly what I said and I apologize if I was upset or if it appeared as a threat. But I'm telling you that is exactly what I intended to say and I'm just begging you to please appreciate that's what I meant to say and that this conversation never happened. . . . .

IB Empolyee-1: . . . [IB Employee-2] was also on the phone, Dan, right, and I just will not be involved in a situation where I lie, okay? I just will not ...

\* \* \*

KAMENSKY: I'm not asking you to lie . . . maybe you can see your way to saying that it was misconstrued . . . That's all I'm saying . . . And this conversation could not have happened. . . .

12

### KAMENSKY Admits "Profound Errors," Resigns from the Committee and Closes Marbe Ridge

14. As part of the UST Investigation, the UST conducted a voluntary interview under oath of DANIEL KAMENSKY, the defendant (the "KAMENSKY Interview"). During the KAMENSKY Interview, KAMENSKY was represented by counsel and advised of the voluntary nature of the interview. Based on my review of a transcript of the KAMENSKY Interview, I have learned the following:

   a. KAMENSKY stated, in substance and in part, that he understood that a Committee member had a fiduciary duty to act "in the best interest of unsecured creditors generally and put those interests above your own personal interests."

   b. KAMENSKY stated, in substance and in part, that during the telephone call described in paragraph 13(g) above, that he "may have" told the IB Employees that their bid for the MYT Securiites "would affect our business relationship going forward," and also that KAMENSKY would "use my membership on the UCC to stop [the Investment Bank's bid for MYT Securities]."

   c. KAMENSKY stated, in substance and in part, when discussing the telephone call with IB Employee-1 described in paragraph 13(k) above, that he did not want IB Employee-1 to lie, but said instead that he was attempting to "manage the message" and hoped that the two could find "common ground" regarding KAMENSKY's position that he had intended to communicate that the Investment Bank should bid for MYT Securities if it was serious.

   d. KAMENSKY stated on multiple occasions, in substance and in part, that his calls to IB Employee-1 were a "terrible mistake" and "profound errors in lapses of judgment [that] violated the personal and professional belief I tried my best to live by."

15. From my review of the Trustee Report, I have learned that Marble Ridge resigned from the Committee on August 1, 2020.

16. From my review of publicly available information, I have learned that on or about August 20, 2020, Marble Ridge advised its investors that it intended to begin winding down operations and returning investor capital.

WHEREFORE, I respectfully request that an arrest warrant be issued for DANIEL KAMENSKY, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

        /s Fatima Haque (By Court with Authorization)
FATIMA HAQUE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to me through the transmission
of this Complaint by reliable electronic means
pursuant to Federal Rule of Criminal Procedure 4.1,
this 2nd day of September, 2020

_____
HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK